DAVIS (BIBBS v.). See Case No. 18,235.

## Case No. 18,288.

### DE KRAFT v. BARNEY.

[2 Hayw. & H. 405.]

Circuit Court, District of Columbia. Jan. 25, 1862.

CONSTITUTIONAL LAW—EFFECT OF JUDGMENTS OF OTHER STATES — GUARDIAN AND WARD — JURISDICTION OF ORPHANS' COURT.

[1. A personal judgment or decree obtained in one state against a nonresident, who has not been served with process in the state, or who has not voluntarily appeared and subjected himself to the jurisdiction, has no extraterritorial validity, and does not come within the operations of the fourth article of the constitution declaring the effect which the judicial proceedings of one state shall have in other states. Therefore a decree of divorce awarding the custody of children to the wife, and declaring the husband and father an unfit person to have them in charge, obtained by default against a nonresident served by publication only, is not conclusive, or even admissible, in a proceeding in another state or in the District against the father to have him declared an unfit custodian for his children and to procure the appointment of another guardian.]

[2. A direction by a testator that his estate shall be held in trust for his daughter and her heirs, free from the control or disposal of any husband she might have, and exempt from his debts, contracts, or engagements, are directed solely to the exclusion of the husband from the absolute right of property which the marriage confers over all personal property of the wife, and from the usufruct for life of the real estate with its rents and profits, and does not refer to the right of guardianship of the husband over the children after the death of the wife.]

[3. The orphans' court of the District of Columbia has no jurisdiction, by virtue of the act of Maryland of 1789 (subchapter 12, § 3, and subchapter 15, § 12) or otherwise, to inquire whether a father be a fit person to be intrusted with the personal custody and education of his children. Its jurisdiction, as to him, extends only to the due care and management of the infant's estate.]

Appeal from orphans' court.

Petition [by John W. De Kraft] for the appointment of a guardian to the minor children of Samuel Chase Barney and Mary E. De Kraft (formerly Barney) deceased.

The following is the opinion of the orphans' court (PURCELL, Judge):

"The above named, John W. De Kraft, filed his petition some months since in this court, praying that some competent person should be appointed guardian to such children. That their father, the said Samuel Chase Barney,

was disqualified and unfit to act as such, and offered in evidence in support of the charges, amongst other facts, a record duly certified, purporting to be a divorce granted by the district court of Jasper county and state of Iowa, on the 18th day of Sept., 1860, in favor of the said Mary E. De Kraft Barney, against the said Samuel Chase Barney, her husband. The said Samuel Chase Barney, in his answer to the above petition, denies the allegations in said petition, and insists that he is not disqualified from acting as guardian to said children, and has offered the evidence of several witnesses in his favor, stating that he was not in their opinion addicted to intemperance. Without special reference to all the facts in the above cause, there is enough in the said decree of divorce of the district court of Jasper county, Iowa, so far as this court has jurisdiction to determine this cause.

"The sentence pronounced by the court granting the said decree was clear and emphatic. It stated that it was a court of competent jurisdiction; that it had jurisdiction of the parties; and of the subject matter, the law having been fully complied with by publication, and that notice had also, with a copy of the petition, been sent to the said Samuel Chase Barney's residence, and that he had been duly and timely served with notice as required by law; that the charges in her petition, which was proved, were others than adultery, and that the said defendant, Samuel Chase Barney was in default; that the said Mary E. De Kraft Barney, born Mary E. De Kraft, was entitled to a divorce from the bonds of matrimony from Samuel Chase Barney, her husband, to whom she was married in the year 1847. The said sentence further stated that the acts, conduct and character of the said defendant, Samuel Chase Barney, had been of such a character as to render him unfit to have the custody of the minor children of the said marriage, and that they be placed under the control of their said mother during their minority.

"If the said court of Iowa had erred, this court has no power to give him, the said Samuel Chase Barney, redress; that his remedy is before another tribunal, the regular appellate court. The above decree cannot be impeached or inquired into collaterally by this court, according to the authorities which are binding upon it. And it is binding also on the said Samuel Chase Barney until reversed. Raborg's Adm'x v. Hammond's Adm'r, 2 Har. & G. 42; Fishwick's Adm'r v. Sewell, 4 Har. & J. 393; Dimond's Adm'x v. Billingslea, 2 Har. & G. 264; Hammond v. Ridgely's Lessee, 5 Har. & J. 245; Comegys v. State of Maryland, 10 Gill & J. 175; House v. Wiles, 12 Gill & J. 338; U. S. v. Bender [Case No. 14,567].

"The fourth article of the constitution of the United States (section 1), and the acts of congress of the 26th of May, 1790 [1 Stat. 122], and March, 1804 [2 Stat. 298], passed in pursuance thereof, expressly declares that full faith and

credit shall be given to all the judicial acts rendered in the different states. Chief Justice Marshall held in the case of Dartmouth College v. Woodward, 4 Wheat. [17 U. S.] 629, that the legislatures of the different states had the right to legislate on the subject of divorce. That the constitution of the United States, which prohibits the states from passing laws impairing the obligations of contracts, was never understood to restrict the general right of the legislature to legislate on the subject of divorce. Those acts enable some tribunals not to impair marriage contracts, but to liberate the parties, because it had been broken by the other. There is another fact in the case, which is entitled to much consideration: Edward De Kraft, the father of said Mary E. De Kraft Barney, deceased, the mother of the above children, by whom the entire estate, belonging now to the said minor children, came, expressly declared in his will that no husband of his daughter should ever control any part of the estate so devised. It appears from satisfactory evidence in this case that Doctor Harvey Lindsley is a gentleman of high integrity in the community, and the court in the exercise of its discretion, believes him under all circumstances, a proper person to be the guardian of the said minor children."

From which decision the respondent, Samuel Chase Barney, appeals.

Walter S. Davidge, for appellant.
Richard S. Coxe, for appellee.

MERRICK, Circuit Judge. The present appeal has its origin in one of those conditions of family embroilment always painful and distressing, which rarely come to the notice of courts of justice, and which still more rarely are investigated by courts with either moral or material advantage to the parties involved. The legal aspect which the present controversy assumes will relieve this tribunal from a critical balance of the criminations and recriminations with which the record abounds. Simple justice requires us, however, to observe that the most flagrant charge against the appellant is utterly unsupported and unwarranted by the evidence which has been adduced in that behalf. The appellee, as prochein ami and near relative, filed his petition against the appellant in the orphans' court, praying that court to refuse to the appellant the guardianship of the persons and estates of the appellant's four children, alleging that he was an unfit and improper person for the office, and charging that he had been divorced from his wife, Mary De Kraft Barney, now deceased, by a decree of the district court of Jasper county, in the state of Iowa, and by that decree the appellant had been deprived of the custody of his children, and that his moral obliquity also was there fully adjudged. The appellee made sundry specific charges in addition, and offered to sustain them by proof. The cause was heard and proofs taken at great length before the orphans' court. That court finally adjudged that insomuch as the court in Iowa had divorced the wife from the appellant, and had decreed his acts, conduct and character to have been such as to render him unfit to have the custody of the minor children of the marriage, and had committed the custody to the mother, the appellant was conclusively bound by that decree, and while unreversed it furnished an answer to his claim for the custody of the persons and estate of his children. The court also determined that the claim of guardianship of the father ought to be controlled by the fact that the estate of the children was derived under the will of the late Edward De Kraft, the maternal grandfather of the children, and he had by his will declared that his estate should be held by trustees in trust for his daughter and her heirs, free from the control or disposal of any husband she might have, and exempt from his debts, contracts or engagements. In both of these conclusions we think there was error in the decision of the orphans' court.

It appears from the record that the appellant was married to his late wife in the District of Columbia in 1847, and continued to reside here for many years; that some years prior to her decease they went to Paris, in France, and there sojourned, he being all the while a lieutenant in the navy of the United States; and that private difficulties having arisen between them, proceedings were instituted in a French tribunal, which decreed temporary custody of the children and a temporary separation of the parties, with leave to the wife to come to America to prosecute a petition for divorce. In the spring of 1860 Mrs. Barney came to the United States, unattended by her husband, and proceeding to the state of Iowa, where neither she nor husband had ever resided, she then filed in the district court of Jasper county her petition for divorce, causing publication to be made against her husband as an absent defendant, and procured a decree of divorce against him by default in September following, containing the allegations and determinations above referred to, and which are now relied upon as irrefragably conclusive against the appellant, not only as touching the marital relation, but also of the facts and charges recited as the basis of the decree, and of the paternal rights of the father over his children.

What might or might not be the effect within the state of Iowa of an ex parte decree of divorce obtained as was the present, and whether all the statutory requirements of the law of Iowa were complied with, so as to vest the district court of Jasper county with a jurisdiction entitled to consideration within the territorial limits of that state, we need not here inquire, it being conclusively settled by the supreme court of the United States in repeated adjudications that a personal judgment or decree obtained in any state of the Union over a non-resident, who has not been served with

process within the state, or who has not voluntarily appeared and subjected himself to the jurisdiction of the court, has no extraterritorial validity and does not come within the operation of the fourth article of the constitution, declaring the effect within one state of judicial proceedings had in another state. Among other authorities, see Shelton v. Tiffin, 6 How. [47 U. S.] 143; Boswell's Lessee v. Otis, 9 How. [50 U. S.] 336; Landes v. Brandt, 10 How. [51 U. S.] 348; D'Arcy v. Kitchen, 11 How. [52 U. S.] 165; and Webster v. Reid, Id. 437; and that a case of divorce is embraced within the principle. See Vischer v. Vischer, 12 Barb. 640; Hill v. Hill, 28 Barb. 23.

Controlled by these authorities, as well as by the dictates of manifest justice, we are of opinion that the record of the court of Iowa was not admissible evidence for any purpose against the appellant in the present controversy.

The provisions of the will of Edward De Kraft, which were relied upon as the second ground of exclusion, when examined, have no relation to guardianship; indeed it cannot be deduced from the terms of the instrument that the matter of guardianship was at all in the mind of the testator. The provisions of the will are directed solely to the exclusion of any husband from that absolute right of property which the marriage confers over all the personal property of the wife, and from the usufruct for life of the real estate, with all its rents and profits. The terms of the will debar him from these, during the marriage, and also from his right of survivorship and curtesy: according to the doctrine of the cases of Marshall v. Beall, 6 How. [47 U. S.] 70, and Ward v. Thompson, 6 Gill & J. 349; but the strict terms of this settlement no more militate against the right of guardianship of the surviving husband than would the terms of a deed in fee simple from a total stranger to the children for a house and lot in this city.

The foregoing considerations dispose of the grounds of judgment relied upon by the court below, but as the act of assembly requires this court, on appeal, to go further (see section 18, subc. 15, Act Md. 1798), the question remains whether upon the testimony of the living witnesses produced by the petitioner, the court below was authorized to refuse to accept from the appellant a sufficient bond if tendered under the statute as natural guardian to his infant children? In other words, has the orphans' court jurisdiction to inquire into the character and conduct of a father, to exclude him from the care and custody of his infant children, and to commit their persons as well as their estates to a stranger?

The power is an inquisitorial power of a most delicate and difficult sort which must inevitably in its exercise bring to light numerous family differences, family difficulties and family misfortunes which it were better for the honor of humanity to cover with the thickest veil of charitable silence. For such investigations the machinery of courts of justice is ill adapted, especially the orphans' courts, whose interference with parental discipline could rarely be exerted usefully. The Vice-Chancellor in 2 De Gex & S. 474, says: "The acknowledged rights of a father with respect to the custody and guardianship of his infant children are conferred by the law, it may be with a view to the performance by him of duties towards the children, and in a sense on condition of performing those duties, but there is great difficulty in closely defining them. It is substantially impossible to ascertain or watch over their full performance, nor could a court of justice usefully attempt it. A man may be in narrow circumstances; he may be negligent, injudicious and faulty as the father of minors; he may be a person from whom the discreet, the intelligent, and the well disposed, exercising a private judgment would wish his children to be for their sakes and his own removed; he may be all this without rendering himself liable to judicial interference, and in the main for obvious reasons it is well that it should be so."

Such being the nature of the power claimed, and such being some of their objections to its exercise, it must be apparent to every one (independently of the injunctions of the act of 1798, "that the orphans' court shall not under pretext of incidental powers or constructive authority exercise any jurisdiction whatever not expressly given,") that its possession by that tribunal should be denied unless beyond all reasonable doubt the terms of the law vest it or the spirit of the law requires it to be comprehended in certain language which seems broad enough to include it.

Prior to the act of 1777 (chapter 8), the courts of the commissary-general and his deputies had jurisdiction only in testamentary affairs, the exclusive cognizance of matters of guardianship being confided to the county courts who were authorized only to appoint guardians to infant orphans who had no natural guardian. The county courts supervised the management of their estates and had it in charge by the act of 1715 (chapter 39, §§ 21, 22), annually to inquire by a jury "whether the orphans be kept, maintained and educated according to their estates," and to remove their guardians upon default found by the jury. This jurisdiction was for the first time transferred to the orphans' court by the act of 1777 (chapter 8). Before that statute the ordinary never exercised, either under the laws of England or the laws of Maryland, any jurisdiction in the matter of the appointment or removal of guardians. See Macph. Inf. 74; Rex v. Delaval, 3 Burrows, 1436; Mouro v. Ritchie [Case No. 9,312]. Upon the revision of our testamentary system by the act of 1789 the orphans' jury was abolished, and in lieu of its functions the orphans' court was authorized by the twelfth section of subchapter 15, upon application suggesting improper conduct in any guardian

whatever, either in relation to the care and management of the property or person of any infant, to inquire into the same, and at their discretion remove such guardian and make choice of another who shall receive the property and custody of the said ward.

It will scarcely occur to any one who will advert to the history of the orphans' jury, and there read the language I have quoted, that the legislature had in contemplation when using the words "any guardian whatever" to confer upon the orphans' court the jurisdiction to enter every family in the land, upon suggestion from a child or some person on his behalf, investigate its private history and discipline, drag all its painful memories before the public attention, and record private shames and private griefs, to the scandal of future as well as the present generation, and yet such is the result of the argument in this case, for it is said that the father is the natural guardian of his children, and as the statute says "any guardian whatever," a natural guardian is included in the expression. This argument has its vice in an inversion of the force of language. The aspect in which the father is viewed by the law is that of parent, and not of guardian; the latter is the subordinate, the former the paramount relation; the less to be controlled by the greater, and not the greater curtailed by the less.

In the language of Blackstone, the relation of guardian is derived out of that of the parent, the guardian being only a temporary parent. Indeed, the loose manner in which the term natural guardian is used has given rise to much perplexity in the law books, and confusion in drafting and interpreting statutes. Its original and proper significance and energy arose out of the conflict between the claims of tenure and of parental right in the matter of lands held under the feudal tenure or knight's service or in chivalry. In that case the right to the custody of the person of the infant heir belonged to the father in exclusion of the lord in chivalry, who nevertheless retained the wardship of the lands, and was entitled also to the custody of the person as against mother, grandfather, and every other relative except the father, whose paramount parental right was acknowledged by the feudal lawyers under the scholastic designation of guardian by nature. It is the character of parent which the law has in view, and its sacredness at common law is admirably illustrated in this, its triumph over the iron exigency of military tenure. Whenever, therefore, our statutes use the term guardian, the father, although in one sense the natural guardian is never to be included, unless there be something more which imperatively demands that he should be embraced by the expression. But it is said that the father is to be embraced by the language of the section, because by the third section of subchapter 12, in case an infant becomes entitled by descent or devise to land or to legacy or distributive share, his natural guardian may be called upon to give

bond for the performance of his trust, and upon his neglect or refusal the court may appoint another guardian. Does it follow from this section that if a father be poor, and by any of the contingencies enumerated his child should receive a large portion, for which he could find no one willing to go his surety, that therefore the court shall deprive him of the care and custody, the training, education and social consolation of his child, and confide not only the estate but the person of his child to some wealthier or better known stranger; and yet this conclusion must be reached before the interpretation claimed can be given to the twelfth section of subchapter 15.

It is obvious that the other guardian, contemplated by the third section, is a guardian of the estate only and not of the person. Repeated adjudication in England has established that a father cannot be deprived of the custody of his child, by a devise or legacy accompanied by the designation of guardian, and what is there held to be repugnant to natural right, we must not impute to the legislation in the construction of a statute, admitting a different meaning.

Chancellor Kent says (2 Comm. 221, note c): "Attempts have been made to control the father's right to the custody of his infant children by a legacy given by a stranger to an infant, and the appointment by him of a guardian in consequence thereof. But it is well settled that a legacy or gift to a child confers no right to control the father's care of the child, and no person can defeat the father's right of guardianship by such means."

In the case of Vanartsdalen v. Boyer, 14 Pa. St. 384, the court on appeal from the orphans' court, held that a devise by a grandfather of lands, &c., to grandchildren, containing a clause, "my executors hereinafter named to be guardians for the children of my said daughter, during their minority, and I do hereby nominate and appoint them for that purpose," meant merely a devise of the guardianship of the property, but was not intended to interfere with the natural right of the father to the custody and care of the children.

Upon these considerations the sound rule of construction would seem to limit the power of substitution to the trust, which the legislature for the first time subjected to the jurisdiction of the orphans' court, by the third section of subchapter 12, to wit: the security and control of the infant's estate, and that being the case, when we apply the provisions of section 12, subc. 15, we should in like manner limit the terms to the subject matter, to wit: the conduct of the father to the management of the property of his child. The case of Fridge v. State, 3 Gill & J. 113, is relied upon as adjudicating this question. Upon looking at the case it will be found that the present inquiry was not by the remotest hint brought to the minds of the court. The point before the court there was whether, it being shown in a suit upon a guardian's bond, collaterally that the mother as natural guard-

ian was living at the time of appointment, that fact did not of itself show that the orphans' court transcended its jurisdiction in appointing a third person guardian. And in meeting that objection, the court of appeals said: "Unless the natural guardian had failed or neglected to *give bond for the performance of her trust on being called upon to do so, in pursuance of the third section of the twelfth subchapter of the act of 1798, c. 101, or had been removed for cause under the provisions of the twelfth section of subchapter 15, it would not have been the case of an erroneous judgment," &c.

This chance expression in the course of a judicial opinion is relied upon as settling the claim of jurisdiction to the extent insisted on by the appellee. The case before the court was a case purely involving the estate of the infant and not relating to its custody; and the court, in speaking of "the removal for cause," does not say for what cause, nor what shall be the extent of the removal, and the language is perfectly consistent with the idea that the cause for which the natural guardian shall be removed must be some misconduct or dereliction touching the estate, and that the removal so to be made is a removal from the control of the estate. Nor do I think the concluding words of the section given any additional force to the claim, for as I have endeavored to show, that from the third section the statute contemplates a separation of the custody of the person and the estate in certain contingencies, and when we come to construe the twelfth section we must adopt the plain rule of rendering consequents according to their antecedents, giving to those cases where the property and persons have both come under the control of the court the right to transfer both; and where the property alone has come under its dominion, the right to transfer the property only. The foregoing limitation of the power of the orphans' court is necessary to harmonize the act of 1798 with the act of congress of February 20, 1846 (9 Stat. 4, c. 8, § 1). By its provisions, when an infant whose father is living shall, by gift or otherwise, become entitled to property separate from the father, the court may compel him to give bond to account for it, as other guardian, and if he fail or refuse, the court "shall have power to appoint a special guardian to take charge of said property, who shall give bond and security as in other cases, but with conditions to suit the case." Here we have a legislative declaration that the separate property of the infant shall, upon the father's default, be given in charge to a special guardian.

Now what reason can be shown why an infant having property by gift should be left to the personal control of his father, while he who has a legacy or distributive share, in the discretion of the orphans' court be committed to the charge of another. For the foregoing reasons we think the orphans' court precluded from inquiring whether a father be a fit person to be entrusted with the personal custody and education of his children, and that its jurisdiction as to him extends only to the due care and management of the infant's estate. It does not appear in this case that the father was permitted to tender a good and sufficient bond for the management of his children's property, nor is there anything in the testimony to show him to be incompetent for that task. We think him entitled to that privilege for aught disclosed upon the record. Should it appear that it is in some very material and important respects essential to the well being and welfare of children, either physically, intellectually or morally that the rights of a father "should be suspended or interfered with, the chancery jurisdiction is ample to afford remedy." Curtis v. Curtis, 5 Jur. (N. S.) 1147. In a proper case that tribunal may be invoked, and the interests of society protected without resorting to dangerous rules of construing statutory grants. It is therefore ordered that the decree of the orphans' court rejecting the application of the appellant to be permitted to give bond for the performance of his trust as natural guardian of the estate of his infant children, and that appointing Dr. Harvey Lindsley guardian of the said infants, be reversed, and said letters of guardianship issued to said Lindsley are hereby annulled, and the cause is remanded to the orphans' court with directions to cite the said Samuel Chase Barney for the purpose of entering into bond with good and sufficient security, to be determined by said court, for the execution of his trust as aforesaid, &c.